HOLLINGSHEAD v. MORRIS.

1. VENDOR AND PURCHASER — BREACH OF CONTRACT — FRAUDS, STATUTE OF—CONTRACTS—ACCEPTANCE—MUTUALITY.

Where the owner of an apartment house placed the property in the hands of a broker for sale and later signed a thirty-day option, being an offer of the property at a price named, but, before any acceptance of it was communicated to him, sold the property to a third person, he was not liable for damages for breach of the contract, in the absence of any payment thereon to him or the delivery of a written acceptance signed by the purchaser.

2. SAME—OFFER AND ACCEPTANCE—LAND CONTRACTS.

It was not a sufficient communication of acceptance, to render the contract mutual and binding under the statute of frauds, that a written acceptance executed by a proposed purchaser was delivered to a third person, a business associate of such signer, and was not delivered to the vendor although the fact of the acceptance in writing was brought to his knowl-

edge after sale of the apartments, and before the expiration of the time limit of the option.

3. FRAUDS, STATUTE OF—MUTUALITY.

　　In order to warrant recovery upon a contract for the sale of land, it must, under 3 Comp. Laws, §§ 9509–9511, be signed by both parties and executed so as to render the obligation mutual.

Error to Wayne; Murphy, J. Submitted June 7, 1912. (Docket No. 40.) Decided October 1, 1912.

Assumpsit by Giotto Hollingshead and another against Isaiah S. Morris for breach of a contract or option for the sale of real property. Judgment for plaintiffs. Defendant brings error. Reversed and no new trial ordered.

*Elbridge F. Bacon,* for appellant.

*Harry M. Lau* (*George M. Sayles,* of counsel), for appellees.

MOORE, C. J. From a judgment in favor of the plaintiffs, the defendant has brought the case here by writ of error.

With one exception there is no substantial disagreement as to the material facts of the case. That exception will be mentioned later. The defendant was the owner of the Abbey Apartments. He listed them with one Keyes for sale. He did not give Mr. Keyes any written authority to sell them. Prior to June 6, 1911, the plaintiff Hollingshead had been interested with one C. F. Doying of Toledo in real estate transactions. Mr. Hollingshead, without the knowledge of Mr. Doying, dictated to a stenographer in Mr. Keyes' office a paper reading as follows:

　　"203 WHITNEY OFFICE BUILDING.

"TELEPHONE MAIN 1951.

　　　　　　　　"DETROIT, MICH., June 6, 1911.

"C. F. DOYING, Esq.,

　　　　"Toledo, Ohio.

"*My Dear Sir:*

　　"At the request of Mr. Hollingshead through Mr. Keyes, I will make the following offer: I will sell you

the Abbey Apartments for $20,000, to be $8,000 cash and subject to a mortgage of $12,000. You to assume the July tax. This offer to hold good if accepted on or before thirty days from date.

"Yours truly."

Mr. Hollingshead took this paper to the office of Mr. Morris, where he signed it, "I. S. Morris." No money was paid at this time or has since been paid. It was then delivered to Mr. Hollingshead. Mr. Hollingshead then mailed the paper to Mr. Doying, who indorsed on the bottom of it the following: "I hereby accept the above offer, C. F. Doying." After doing this, he mailed it to Mr. Hollingshead with a letter reading as follows:

"TOLEDO, O., June 12, '11.

"Mr. G. HOLLINGSHEAD,
      "Detroit, Mich.

"*Dear Sir:* Yours of the 7th containing Dr. Morris' offer to sell the Abbey Apts. subject to $12,000 mtg., and $8,000.00 cash received. This is satisfactory to me and I expect to be able to close the deal with the doctor long before the 30 days expire which he has given me to raise the money in. As soon as I am ready to close the deal will let you know.

"Thanking you for your trouble in the matter so far, I am,

"Yours truly,
      "C. F. DOYING."

When these papers were received by Mr. Hollingshead June 13, 1911, he at once took them to the office of Mr. Keyes and showed them to him. After reading them, Mr. Keyes returned them to Mr. Hollingshead. Mr. Keyes, in the presence of Mr. Hollingshead, called the defendant by telephone, and told him that Mr. Hollingshead had an acceptance of the offer. The reply of the defendant was that he had already sold the property, and this statement was communicated to Mr. Hollingshead. Mr. Keyes then made over the telephone an appointment for Mr. Hollingshead to go to the office of Mr. Morris. He at once went there, and told Mr. Morris his offer had been accepted, and showed Mr. Morris the letter of Mr.

Doying to Mr. Hollingshead of date June 12, 1911. Mr.
Morris read the letter, and told Mr. Hollingshead he had
sold the property, and the deal was off. Mr. Hollings-
head did not show Mr. Morris the paper of June 6, 1911,
which Mr. Morris had signed, nor did he show him the
writing on the bottom thereof signed by Mr. Doying.
His version of why he did not do so is as follows:

"I did not show him anything else besides this letter
that day. I had the option with me in my pocket. As I
came out of Mr. Keyes' office, I walked down. It was
but two flights. Instead of taking the elevator, I walked,
and, when I got to the central landing, I took out this
letter, and took the option from it, and put it in another
envelope. I have not that envelope now. I put it in the
other envelope to keep it clean, and put it in my pocket.
I did not show that option to the doctor that day, and I
did not tell him that I had it.

"*Q.* Why not?

"*A.* As I said a few minutes ago, when I told Mr.
Keyes and showed him the option and the letter and told
him that it was accepted, he called up the doctor, and the
doctor said he had sold the property, and he would not
carry out that deal. I knew the doctor had not signed,
at the time, the other copy of the option. I know he did
not at the time, when he signed the one, because he only
signed the one and kept the other without signing it. I
did not know but what he signed it in the meantime, but
I knew he had signed the one I had, and I knew, also,
Mr. Doying had signed it, and there was no one there
present but myself and the doctor. He had refused, be-
fore I went there, to carry out the deal, and I thought if
I handed him that then, and he took it and tore it up and
put it in his pocket, it would be between him and me. He
might say he never had it, and I, that he had it, and that
would be all there was to it. I thought I would keep it
in my possession until I had some proof that I delivered
it to him. There was nothing said about the option at
all, not a word. All I said was that I had a letter from
Mr. Doying that the deal was satisfactory, and that he
expected to close it up long before the 30 days."

No delivery of this acceptance was made to Mr. Morris,
and no tender thereof before this suit was brought.

It is the claim of Mr. Hollingshead that he had arranged with Mr. Quinn to furnish the $8,000. After leaving the office of Mr. Morris on June 13th, Mr. Hollingshead went to the office of Mr. Quinn. The testimony is that:

"On June 14, 1911, as testified to by Hollingshead and Quinn, or on June 21, 1911, as testified to by defendant, Hollingshead and Quinn went to the office of defendant and Hollingshead said:

"'Dr. Morris, this is Mr. Quinn, the gentleman who is going to furnish the $8,000 for Mr. Doying to carry out the purchase of your apartments, to carry out this option that you have given him for these apartments.'

"And at the same time Mr. Hollingshead handed to the defendant the offer with the acceptance of Doying indorsed thereon. Defendant read it over and handed it back to Mr. Hollingshead, and said: 'I do not want this. The deal is off.' He sat down at his desk and turned to his papers, and Mr. Hollingshead and Mr. Quinn went out. No money was offered or tendered to the defendant by Mr. Hollingshead or Mr. Quinn at this time, and no money was at any time offered or tendered to defendant on this offer by or on behalf of Mr. Doying or the plaintiffs. This was the last time that 'Mr. Hollingshead or Mr. Quinn saw defendant in regard to this deal."

On June 15, 1911, the defendant wrote a letter to Mr. Doying that the deal was off. On June 24th Mr. Doying employed Mr. Fick, an attorney in Detroit, to look after his interests. On the 6th of September, 1911, he assigned his interest in the contract to the plaintiffs. No money was paid to him for the assignment, and he has never paid any money upon the transaction. This suit was commenced September 15, 1911. The defendant made a contract to sell the Abbey Apartments to one Shapiro June 8, 1911, and received a payment thereon.

It is the defendant's claim that on June 9, 1911, he informed Mr. Keyes that he had sold the property, and that Mr. Keyes at once informed Mr. Hollingshead. Mr. Keyes did not remember such a conversation, and Mr. Hollingshead denied that such a conversation occurred.

A special question was submitted to the jury. The fol-. lowing is part of their verdict:

" And to special question, 'Did Mr. Keyes, in his office, on June 9, 1911, say to Mr. Hollingshead that the property had been sold by Dr. Morris to some other than Mr. Doying ?' the jury answer, 'No.'"

At the close of the testimony the defendant asked for a directed verdict. This was refused.

It is the claim of the plaintiff that, when Mr. Doying made the writing on the bottom of the paper of June 6, 1911, and Mr. Hollingshead showed them to Mr. Keyes, this constituted an acceptance that bound the parties. The appellant's claim is stated in part by his counsel as follows:

" The court erred:
" (1) In refusing the request of the defendant to direct a verdict for defendant for the reason 'that the option was recalled or retracted before there was any attempt to accept it, as a matter of law, under the testimony.'
" (2) In refusing the request of the defendant to direct a verdict for defendant, for the reason 'that the sale of the property by defendant was a retraction of the option, as a matter of law, as soon as it was communicated to the other party.'
" (3) In refusing the request of the defendant to direct a verdict for defendant, for the reason 'that there was no acceptance of the offer, whether it was recalled or not.'
" (4) In refusing the request of the defendant to direct a verdict for defendant for the reason 'that the option could not be accepted, except by the actual payment or tender of the $8,000.'
" (5) In ruling that 'there could be no due acceptance of the instrument until Mr. Hollingshead made adequate communication of Mr. Doying's acceptance to the defendant.' What, in law, amounts to such adequate communication ? It is urged, in behalf of the defendant, that nothing short of legal delivery of the instrument to the defendant would satisfy the exactions of the law. It is claimed by the plaintiff, on the contrary, that retention of the instrument by Mr. Hollingshead would not operate as a failure to make acceptance. If such sufficient oral

notification was given Mr. Morris before any retraction of the offer by Mr. Morris, in my view the latter is the correct contention."

We quote the following from the brief of counsel for the plaintiff:

"We agree with the appellant that, the offer being given without consideration, the same was subject to revocation at any time before acceptance, as was said in *Cooper* v. *Wheel Co.*, 94 Mich. 272, at page 275 [ 54 N. W. 39, 34 Am. St. Rep. 341]: 'It is now generally held that if a proposition be made, to be accepted within a given time, it constitutes a continuing offer, which, however, may be retracted at any time. But if, at any time before it is retracted, it is accepted, such offer and acceptance constitute a valid contract,' citing *Railroad Co.* v. *Bartlett*, 3 Cush. ( Mass.) 224, where 'it was held that a proposition in writing to sell land at a certain price, if taken within 30 days, is a continuing offer, which may be retracted at any time, but if, not being retracted, it is accepted within the time, such offer and acceptance constitute a valid contract,' citing *Wilcox* v. *Cline*, 70 Mich. 517 [38 N. W. 555].

" 'Like all other offers or proposals upon the part of one party in the course of negotiations with another, the written option in this case was not binding upon defendant until accepted, and he was at liberty to withdraw it at any time before acceptance; but, when accepted before such withdrawal, the contract was then completed and mutual.'

"And that in order for Doying to turn said offer into a valid contract he was required to do two things: (1) Unconditionally accept said offer. (2) Communicate notice of such acceptance to Morris or his duly authorized agent before Doying had notice of revocation."

It is the claim of his counsel that both of these things occurred.

There are four important facts that stand out unquestioned in this case: First, that the defendant had sold the property to Mr. Shapiro before Mr. Doying ever received any communication from defendant; second, that no written acceptance was shown to the defendant before he notified both Mr. Keyes and Mr. Hollingshead that he had

sold the property; third, that no written acceptance was delivered to him or tendered to him before he revoked his offer to sell; fourth, no money was tendered to him, to apply on the contract before he revoked his offer to sell. We cannot state the contention of counsel for appellee better than to quote from the brief:

" The trouble with this question of the statute of frauds is this: Defendant's counsel has not cited the right section. He cites section 9509, when as a matter of fact section 9511 is the section applicable to the facts in the case at bar, and what does it provide:

"SEC. 9511: 'Every contract  *  *  * for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof, be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized by writing.'

" We admit that under this section Keyes would have had to have written authority from Morris in order to bind him to a contract of sale which was signed by Keyes as agent for Morris, but that is not our case. As we said before, it is Morris' own signature that was placed on the contract, and the transaction was only carried on through his agent, Keyes. ' At the request of Mr. Hollingshead through Mr. Keyes, I will make you the following offer.' The statute only requires a note or memorandum to be in writing, and signed by the party by whom the sale is to made, and not the purchaser, as we have already seen; therefore, if the purchaser is not required to sign the contract, must he give a written notice of his acceptance of the contract ? We fail to appreciate the force of defendant's contention that the telephone communication from Morris' agent Keyes to Morris on June 13, 1911, of Doying's acceptance of the offer, should be in writing in view of our statute and the authorities generally cited above. We have found a respectable authority where this identical point has been passed upon."

Counsel cite *Alford* v. *Wilson*, 95 Ky. 506 (26 S. W. 539), and *Smith's Appeal*, 69 Pa. 474. These cases sustain the contention of counsel, but their reasoning does not appeal to us.

As there was no payment made, how could the vendor

hold Mr. Doying liable until a written acceptance had been delivered to him? Until this was done, where was there any mutuality of contract? Did the mere fact of indorsing the paper of June 6th by Mr. Doying bind him? If, after he had signed the paper, he had locked it in his desk, would he then have been liable? If after he had mailed it to Mr. Hollingshead he had telegraphed the latter not to deliver it, and Mr. Hollingshead had followed his instructions, would Mr. Morris have a claim which he could enforce against Mr. Doying? To ask these questions suggests an answer. In *Wilkinson* v. *Heavenrich*, 58 Mich. 574 (26 N. W. 139, 55 Am. Rep. 708), Justice CHAMPLIN, speaking for the court, said:

"The conflict of authority upon questions of the kind raised upon this record is truly bewildering, and the cases are incapable of being reconciled with each other; a large and respectable class holding that a contract which the statute of frauds declares shall not be valid unless in writing, and signed by the party to be charged therewith, need only be signed by the party defendant in the suit, and that it is no objection to maintaining such suit and recovering upon such contract, that the other party did not also sign, and was not bound by its terms. 2 Kent's Com. 510; 2 Stark, Ev. 614; *Smith's Appeal*, 69 Pa. 480; *Tripp* v. *Bishop*, 56 Pa. 428; *Perkins* v. *Hadsell*, 50 Ill. 217; *Old Colony Railroad Corporation* v. *Evans*, 6 Gray (Mass.), 31 [66 Am. Dec. 394]; *Williams* v. *Robinson*, 73 Me. 186 [40 Am. Rep. 352]. Another and equally respectable class of jurists holds that unless the party bringing the action is bound by the contract neither is bound because of the want of mutuality. *Lees* v. *Whitcomb*, 3 C. & P. 289; *Sykes* v. *Dixon*, 36 E. C. L. 366, 9 Ad. & El. 693; *Krohn* v. *Bantz*, 68 Ind. 277; *Stiles* v. *McClellan*, 6 Colo. 89. And see, also, as bearing upon the question, *Hall* v. *Soule*, 11 Mich. 496; *Scott* v. *Bush*, 26 Mich. 418 [12 Am. Rep. 311]; *Liddle* v. *Needham*, 39 Mich. 147 [33 Am. Rep. 359]; *McDonald* v. *Bewick*, 51 Mich. 79 [16 N. W. 240]. The cases above cited are not intended to be exhaustive on either side of the proposition.

"I shall not attempt a reconciliation where reconciliation is impossible; but, as the question is new in this State, the court is left to adopt such view as appears to

rest upon principle. It is a general principle in the law of contracts, but not without exception, that an agreement entered into between parties competent to contract, in order to be binding, must be mutual; and this is especially so when the consideration consists of mutual promises. In such cases, if it appears that the one party never was bound on his part to do the act which forms the consideration for the promise of the other, the agreement is void for want of mutuality. *Hopkins* v. *Logan*, 5 M. & W. 241; *Dorsey* v. *Packwood*, 12 How. (U. S.) 126; *Ewins* v. *Gordon*, 49 N. H. 444; *Hoddesdon Gas Co.* v˙ *Haselwood*, 6 C. B. (N. S.) 239; *Souch* v. *Strawbridge*, 2 N. G. & S. 808; *Callis* v. *Bothamly*, 7 Wkly. R. 87⸴ *Sykes* v. *Dixon*, 9 Ad. & El. 693; Addison on Contracts, § 18; Parsons on Contracts, 449; *Utica, etc., R. Co.* v. *Brinckerhoff*, 21 Wend. (N. Y.) 138 [34 Am. Dec. 220]; *Lester* v. *Jewett*, 12 Barb. (N. Y.) 502."

See, also, *Jackson* v. *Sessions*, 109 Mich. 216 (67 N. W. 315); *Mull* v. *Smith*, 132 Mich. 618 (94 N. W. 183). In the absence of any payment by Mr. Doying or the delivery of any written acceptance signed by him, how can it be said Mr. Doying is bound to perform upon his part so as to make the contract mutual? We think a verdict should have been directed in favor of the defendant.

The judgment is reversed, and no new trial ordered.

STEERE, McALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.